[Civ. No. 22810. Second Dist., Div. One. July 9, 1958.]

REALTY CORPORATION OF AMERICA, INC. (a Corporation), Appellant, v. ROY W. BURTON, as Special Administrator, etc., et al., Respondents.

Wolver & Wolver and Eugene L. Wolver for Appellant.

Avery M. Blount for Respondents.

WHITE, P. J.—Plaintiff instituted this action to recover certain real estate commissions allegedly due from defendants. Plaintiff's first amended complaint contains six causes of action, in the first of which it was alleged that plaintiff is a licensed real estate broker and on or about October 17, 1952, entered into a written agreement with defendants under the terms of which plaintiff was authorized and empowered to sell for and on behalf of defendants certain real property. That said agreement set forth a "list price" at which each lot, piece or parcel of real property could or should be sold by plaintiff and provided that the compensation of plaintiff would be 55 per cent of said list price, and that defendants should receive 45 per cent of said list price.

It is then alleged that the aforesaid agreement was on or about November 1, 1952, supplemented by an *oral agreement* to the effect that if any property be sold at a price in excess of the list price, plaintiff should receive 55 per cent of the actual sale price, the defendants 45 per cent of the list price, and the balance, if any, thereafter remaining, would be distributed 55 per cent to plaintiff, 45 per cent to defendants. That this oral agreement was evidenced by a written memorandum dated November 20, 1952, and that commencing on said 20th day of November, 1952 and subsequent thereto, the defendants computed, made and rendered to plaintiff written commission reports prepared by the defendants, wherein all sales made by plaintiff in excess of the said list price were indicated by the defendants and payments made by the defendants to the plaintiff in accordance with said oral agreement. That upon the last several commission reports made by the defendants to the plaintiff, commissions have been

indicated as payable to the plaintiff, but that the same have not been paid, and the same are due, owing and payable.

The second cause of action is predicated upon the same factual basis as the first cause of action, but pertains to "trade in" lots, which were to be computed on the same principle except that the cost of the "trade in" lot would be in lieu of the list price, upon which there was owing from the defendants to the plaintiff, the sum of $33.25.

The third cause of action is a common count for monies due for the same sum as that set forth in the first cause of action.

The fourth cause of action is a common count for an open book account in the same sum as that set forth in the first cause of action.

The fifth cause of action is a common count for an account stated in the same sum of money as that set forth in the first cause of action.

The sixth cause of action seeks declaratory relief as to the sums of money to which plaintiff is entitled, by reason of the written agreement, the oral agreement, the written memorandum thereof and the subsequent conduct of the parties in the interpretation of their agreements and contractual rights.

By their answer to the first cause of action defendants presented a general denial of all the allegations thereof except to historical facts as to the written contractual relationships between the parties. The answer to the second cause of action also set forth a general denial subject to the aforesaid exception. As to the third, fourth, fifth and sixth causes of action the answer was the same as that made to the second cause of action.

As a second defense, the answer alleged that a certain written agreement allegedly entered into on or about August 7, 1953, wherein "Plaintiff was authorized and empowered to sell for and on behalf of defendants, certain real property in said agreement described," is illegal and void ". . . in that said agreement does not contain a definite and specified date of final and complete termination."

For a third defense, the answer alleged that two certain letters written by defendant L. W. Coffee to plaintiff, and attached to and incorporated in the complaint as Exhibits "A" and "B," were made without any consideration therefor whatsoever.

For a fourth defense and by way of counterclaim defendants sought to recover on a common count, the sum of

$8,592.23 for monies had and received. However, this was subsequently withdrawn by defendants.

During the trial defendants were permitted to file an amendment to their answer to the first amended complaint, wherein they set forth for a first separate and distinct defense, the historical background of the contract involved and its assignment to the present litigants; that such contract had been the subject of a prior lawsuit, wherein an appeal was taken from the judgment therein, and that said judgment appealed from was an adjudication of the rights herein alleged in the first cause of action of the first amended complaint.

For a second separate and distinct defense, it was alleged that such defense was the same as pleaded in certain paragraphs of defendant's first separate and distinct defense of said first amended complaint.

For a third separate and distinct defense it was alleged that plaintiff's sixth cause of action "was fully tried and determined and judgment rendered in favor of these defendants and against the plaintiffs herein."

For a fourth separate and distinct defense it was alleged that the six causes of action of the first amended complaint do not state facts sufficient to constitute a cause of action.

For a fifth separate and distinct defense, that by reason of said prior action, the contract of October 17, 1952, is void and without force and effect.

For a sixth separate and distinct defense, that the first five causes of action of the first amended complaint are barred by the statute of frauds.

When the cause was called for trial, the judge announced that he had examined the pleadings and the exhibits. He then summarized the provisions of the original contract of October 17, 1952, with regard to the compensation or commissions to be paid to plaintiff, and thereupon stated:

"Now, those provisions are all very clear and explicit and consequently require no evidence in the interpretation of that contract.

"The position of the Plaintiff is that there was, an oral contract entered into subsequent to the entry into this written contract and that by the terms of that oral contract there was a change made with respect to what the Plaintiff was to receive. The oral contract being squarely contrary to the provisions of the written contract may not be shown in evidence.

"The letter written by the Defendant to the Plaintiff stating that he was enclosing a statement or a report of commissions and that thereafter his reports would be along that same line does not by its terms indicate that that letter was to constitute a change of any of the terms of the written contract.

"I am of the opinion that the entire case will have to turn upon the provisions of the written contract. . . ."

The trial judge then stated that insofar as defendants' motion to abate the instant action was concerned, he had concluded there was no abatement thereof by reason of the prior action set forth in defendants' first separate and distinct defense contained in their amendment to their answer to the first amended complaint.

The court then stated: "I am calling to counsel's attention my views with respect to the parol evidence rule and the thought that there is no sufficient amendment in the writing of that original contract of October, 1952, upon which the Plaintiffs can stand. . . ." The original contract of October 17, 1952, was received in evidence by stipulation.

Plaintiff's counsel then stated: "It is apparent your Honor will hold that certain of the oral testimony upon which the plaintiff's case is based is inadmissible . . . Therefore, with the permission of the Court I should like to make an offer of proof . . ." Upon the announcement by plaintiff's counsel that all witnesses referred to in the offer of proof were personally present in the court and ready to testify it was stipulated that the necessity of calling such witnesses be dispensed with. Thereupon plaintiff's counsel made his offers of proof which may be summarized as follows: That at the time the original contract of October 17, 1952, was entered into under the terms of such contract and for the practical purpose of sale, it was necessary that a schedule be made of the owners' list price, namely, the price at which the respondent had theretofore been selling or listing each individual lot, since the "release price" to be paid to the owner, was to be computed at 60 per cent of such "Owners' List Price."

That Mr. Carpenter, the sales manager for appellant offered to compute such schedules, but the defendant, L. W. Coffee, refused to permit the same and stated he would compute such schedules himself. At said time and prior theretofore, it had been indicated that the plaintiff's predecessor, as the real estate broker, would not be able to operate upon the 40 per cent of the "Owners' List Price" remaining after the deduction of the release price of 60 per cent thereof, and that such

real estate broker must have a commission of 55 per cent, which would require that the new list price be increased sufficiently that it would total the 55 per cent commission and the aforesaid "release price."

That, on the initial weekend of sales, some five or six sales were made. Mr. Carpenter checked the same as against the said schedule (hereinafter designated "Coffee Schedule") annexed to the contract, and ascertained that both as to such sales and as to spot checking of the "Coffee Schedule," a few of the prices were mathematically inaccurate; a few of the prices were high, but most of the same were low; that is, if the land be sold at the amount set forth in said "Coffee Schedule" as the list price, such price would be insufficient to pay a full "release price" or a full 55 per cent commission. Mr. Carpenter phoned defendant Coffee and informed him of this situation and offered to make a new schedule which would be mathematically accurate, so that the broker could obtain a full 55 per cent commission, and the seller could obtain a full "release price." Mr. Coffee agreed to the making of such schedule, and the same (hereinafter designated "Carpenter Schedule") was thereafter prepared under Mr. Carpenter's supervision. The same was completed in late October or early November, 1952. Carpenter took the same to Coffee's office in Los Angeles and there he and Mr. Coffee spot checked the "Coffee schedule" as to 10 or 15 sales prices, which they found to be inaccurate, their actions therein being observed by Miss Fearrington, Mr. Coffee's office manager. Mr. Carpenter thereupon produced the "Carpenter schedule," and he and Mr. Coffee spot checked it as to 20 to 25 sales prices, which they found to be accurate. This also was observed by Miss Fearrington. Mr. Coffee thereupon instructed Miss Fearrington to use the "Carpenter (new) schedule." After Mr. Carpenter left, Mr. Coffee further instructed Miss Fearrington to abandon the "Coffee (old) schedule," and thereafter use the "Carpenter (new) schedule."

While Mr. Carpenter was in the office with Mr. Coffee, the former called the latter's attention to the fact that for a period of many years, Mr. Coffee had not been too successful in selling the lots involved, at the prior "Owners' List Price." That this was the basic reason why plaintiff's predecessor had initially been contracted to act as real estate broker. Mr. Carpenter was then convinced, after his first week's experience, not only could the land be sold for the owners' list price, as contained in the modified "Carpenter schedule," "but we

can sell this land for a much larger sum. However, if we do that we will have to expend additional sums, and we contemplate spending in excess of $100,000. We will have to spend a lot more energy in talking to our salesmen who will make less sales but larger sales, but I know it can be done." Mr. Carpenter thereupon explained to Mr. Coffee that all office expenditures as well as salesmen's commissions and overrides, were predicated upon the actual sales price. Mr. Carpenter then stated the terms under which the sales campaign would be conducted at expenditures in excess of $100,000, namely, that the real estate broker would receive a 55 per cent commission on the actual sales price, "that is the amount the purchaser pays," which sum, together with the release price, would be deducted from the sales price and the balance or surplus, if any, would be allocated 55 per cent to the broker and 45 per cent to the respondents. Upon said novations being stated, Mr. Coffee said "that is agreeable," and Mr. Carpenter requested Mr. Coffee to confirm this understanding by letter. Mr. Coffee stated he would do so concurrently with the first schedule of computation of commissions due, and suggested that the form thereof be worked out. Mr. Coffee suggested that the same be jointly done by Mr. Carpenter and himself, and thereupon, by such joint effort, the subsequently used form of commissions report was drawn up. Such form was specifically originated in accordance with the existing agreement between the parties as to the computation of broker's fees, the release price, and the allocation of the surplus thereof, 55 per cent to the broker and 45 per cent to the "Owner." Miss Fearrington participated in the preparation of such rough draft. The draft thereof was printed and such printed form was thereafter utilized for all commission reports prepared by the defendants.

That such printing was completed during the first week of November, 1952. About the same time, Mr. Coffee stated to Mr. Carpenter that he was the agent for a Mr. Wardman, who had encumbrances upon Desert Hot Springs property and who owned a number of lots in Palm Desert, an area between Palm Springs and Indio on State Highway 112; that Mr. Wardman would be agreeable to the sale of such lots upon the same arrangement then existing between plaintiff's predecessor and the defendant, L. W. Coffee.

Mr. Carpenter requested Mr. Coffee to prepare a contract with similar terms. Mr. Coffee answered that he would do so and would have the same approved by Mr. Wardman. On

November 17, 1952, Mr. Coffee conferred in his office with Mr. Wardman, Mr. Carpenter staying in Mr. Coffee's waiting room for three-quarters to one hour, during such conference. When Mr. Carpenter was admitted into the presence of Mr. Wardman and Mr. Coffee, Mr. Wardman, who wanted a contract for his lots in Palm Desert, the same as Mr. Coffee had informed Mr. Wardman was the terms under which the lots in Desert Hot Spring were being sold, inquired of Mr. Carpenter if the contract prepared by Mr. Coffee and then offered to him was the same as Mr. Coffee then had with the plaintiff, as the original thereof would be modified by Mr. Coffee's letter. The specific terms thereof were enumerated by Mr. Wardman, namely, that the commission would be 55 per cent of the actual sales price; that there would be in addition thereto, a release price being equal to 60 per cent of the former owners' list price, and that the balance or surplus, if any, to be allocated 55 per cent to the broker and 45 per cent to the owner. The fact that the contract offered to Mr. Wardman, in regard to the lots in Palm Desert, was the same as the contract between the parties, upon the lots in Desert Hot Springs, to be thereafter verified by letter, was concurred in by both Mr. Carpenter and Mr. Coffee. This contract was executed two days thereafter, namely, on November 19, 1952. A copy thereof was marked as Exhibit 4 for identification. Set forth therein, in paragraphs Fifth and Sixth, is a summary of the method of computing the broker's commission and release price. An epitome thereof is that the commission is computed upon the actual sales price, the release price is equal to 60 per cent of the former ''Owners' List Price,'' and that any surplus remaining thereafter would be allocated 55 per cent to the broker and 45 per cent to the owner. Shortly thereafter, Mr. Coffee, as the agent for Mr. Wardman, indicated that the commission reports would be made to the broker by him, as Mr. Wardman's agent, upon the form of commission reports theretofore evolved through the joint efforts of Mr. Carpenter, Mr. Coffee and Miss Fearrington, for use in sales in Desert Hot Springs. Subsequently, Miss Fearrington came to the office of Mr. Wardman and indicated the computation of broker's commission as aforesaid. During the same period, Mr. Coffee explained to Mr. Cook, a public accountant employed by Mr. Wardman, the computation of commissions by the aforesaid method.

About November 10, 1952, the first commission check was received by plaintiff's predecessor, from Mr. Coffee's office.

A commission report indicating an amount due in conformity with said check dated November 10, 1952, was received with Mr. Coffee's letter of November 20, 1952. Such letter reads as follows:

"The attached Commission Report dated November 10th, 1952, for which remittance was made to you on November 10th, shows the Release Price, Sales Price, Total Commission, Shortage subtracted from the 55% commission, *also shows surplus over and above the release price and 55% commission, and the division to Agent of 55%; to Owner 45%.*

"All following reports will be shown in this manner.

"The surplus, if any, shall not be paid until the Agent's total commission and the Owner's release price have been paid." (Emphasis added.)

That the commission report was drawn in conformity with the novated method of computation as summarized in said letter. The letter of November 20, 1952, was dictated by Mr. Coffee to Miss Fearrington. Thereafter semimonthly commission reports were sent, all computed upon the same method. Such subsequent semimonthly commission reports were offered as part of the offers of proof. In addition thereto, mathematical computations were prepared by the plaintiff, which indicated that each and all of such commission reports were prepared by the defendants and computed by them as indicating that the plaintiff, as real estate broker, was entitled to a commission of 55 per cent of the actual sales price; that said sum, together with the "release price" was deducted from the actual sales price, and that the balance or surplus, if any, was allocated 55 per cent to plaintiff and 45 per cent to defendants. All of the sales indicated in said exhibit for identification were made prior to May 15, 1954. Likewise, such exhibits indicate that where a deficit existed, the same was chargeable to the broker.

That by reason of the claimed novation, as aforesaid, and the letter of November 20, 1952, plaintiff expended or caused to be expended, $100,000 on an extensive sales campaign. This was at least $50,000 larger than any originally anticipated campaign. That such expenditures were necessary in order to get the increased sales price for the individual lots. That the same was done with the knowledge of Mr. Coffee who informed Mr. Wardman of the fact that his letter novating the agreement, was resulting in the spending of a "large sum" by the appellant for an advertising campaign.

That although not involving substantial monies, the ar-

rangements as to "trade in" lots, are indicative of the agreement between the parties. Between November 20, 1952, and February 4, 1953, there were two or more conversations between Mr. Carpenter and Mr. Coffee concerning lots received by way of "trade in." It was agreed between these parties that such lots should be handled in the same manner as the other lots sold in Desert Hot Springs, except in lieu of the release price, the cost of the lots would be considered. Mr. Coffee was to acknowledge this arrangement by letter. As the result thereof and in compliance with his commitment, Mr. Coffee wrote the letter of February 4, 1953. That it shows the same basic plan of computation of commissions and allocation of surplus, providing in the pertinent part thereof, ". . . Sell the property, deduct 55% from the sales price, add the costs of acquiring the same and the balance is to be divided 55% to Realty Co. of America, 45% to L. W. Coffee, provided always that the surplus over and above the original 55% is sufficient to pay for the cost of receiving and disposing of same."

It was stipulated that said letter was typed by Ann Ingraham, an employee of the defendants.

That although the numerous semimonthly commission reports were usually accompanied by checks, the last report and computations were not. These consisted of $5,109.52, representing unpaid commissions of 55 per cent of the sales price and three statements for 55 per cent of the surplus in excess of commissions and release price in the respective sums of $116.41, $238.25 and $206.71. Such amounts aggregate the sum of $5,670.89, upon which plaintiff brought all but the second cause of action of its first amended complaint.

That said statements contained in Exhibit 8 for identification, were not accompanied by any check and the amounts sued for are unpaid, it being stipulated that said commission report of July 25, 1955, and the surplus reports which constitute Exhibit 8 for identification, were mailed by the defendants on or about the date that the same bear, to the plaintiff, and that no remittance was made thereon. That the sum of $5,109.52 shown upon the commission report of July 25, 1955, represented unpaid commissions on the initial 55 per cent of the sales price and did not involve any surplus above commissions and release price. The other amounts are the sums due on June 25, 1955, July 10, 1955, and July 25, 1955, being the 55 per cent of the surplus after the deduction of commissions and release price.

Defendants' objection to the foregoing offer of proof on the ground "that it tends to vary or change the terms of a written document by parol evidence" was sustained.

The court signed written findings of fact wherein it found that the original agreement of October 17, 1952, was entered into. That said agreement provided that the plaintiff be compensated by 55 per cent of list price. That there had not been any oral novation thereof, giving to plaintiff a commission of 55 per cent of the actual sales price, and a like percentage of the surplus after deducting the original commission and the release price, payable to the defendants. That the letter of November 20, 1952, had been delivered by the defendants to plaintiff. That with said letter there was transmitted to plaintiff the initial commission report, but that it is not true that said commission report attempted to novate the terms of said agreement. That defendants prepared and sent to plaintiff semimonthly commission reports, the last of which was received on or about June 29, 1955. That there was no valid oral or written novation or amendment to the agreement of October 17, 1952. That there was no commission, monies or compensation due thereunder. That there was no oral amendment to the agreement as to the "trade in" lots. That the letter of February 4, 1953, was delivered by the defendants to plaintiff, that said letter is not a written memorandum of any agreement in regard to "trade in" lots, and that no monies are due by reason of "trade ins." That an actual controversy exists between the plaintiff and defendants as to the commissions to which plaintiff was entitled under the contract of October 17, 1952, and that plaintiff contends it was entitled to compensation under the novated and amended agreement. That the exhibits annexed to the first amended complaint were made without consideration.

Judgment was entered in favor of defendants for their costs and for declaratory relief in their favor, to the effect that there had been no agreement which changed, modified or novated the written agreement of October 17, 1952. From such judgment, plaintiff prosecutes this appeal.

We are satisfied that the contention of appellants that the evidence contained in the foregoing offer of proof was properly admissible for the purpose of proving a collateral agreement, or supplemental agreement or a novation to the original written agreement of October 17, 1952, must be sustained. Though it be conceded that the terms of the original contract of October 17, 1952, entered into with appellant's

assignor covered or pertained to sales in excess of the list price, nevertheless, it seems manifest that a supplemental written agreement was entered into as evidenced by the letters of November 20, 1952, specifically referring to surplus above the list price, and the letter of February 4, 1953, pertaining to ''trade in'' lots. The first of these letters addressed to appellant by respondent Coffee states in part, ''The attached Commission Report dated November 10th, 1952, for which remittance was made to you on November 10th, shows the Release price, Sales Price, Total Commission, Shortage subtracted from the 55% commission, also shows surplus over and above eht (sic) release price and 55% commission, and the division to Agent of 55% ; to Owner 45%.

''All following reports will be shown in this manner.''

The second letter, also written by respondent Coffee to appellant, reads as follows:

''In reference to the trades where you took in lots in Desert Hot Springs and/or Apple Valley and Rocket Town, which are already in my name, will go through as outlined in our original agreement:

''Sell the property, deduct 55% from the sales price, add the costs of acquiring the same and the balance is to be divided 55% to Realty Co. of America, 45% to L. W. Coffee, provided always that the surplus over and above the original 55% is sufficient to pay for the cost of receiving and disposing of same.

''Please take notice that from today on, so long as you pay the release price of any lots in any of my Tracts in Desert Hot Springs, you can make any trade that you so choose and whatever you take in is yours and you can do as you please with the same.''

It seems clear to us that each of these letters indicates a consistent new method of compensation to the real estate broker to be computed by deducting 55 per cent of the sales price, adding thereto, either the release price or the costs of acquiring the ''trade in'' lot and the balance or surplus, if any, is to be allocated 55 per cent to the broker and 45 per cent to the owner. In each of the letters it is indicated that the surplus is not to be allocated until each of the parties has received the full amount to which they are entitled, prior to the obtaining of such surplus.

■ An agreement may be supplemented by the parties provided that such supplement is predicated upon an adequate consideration (12 Cal.Jur.2d 233, Contracts, § 37). ■ The

offers of proof herein indicate that the consideration consisted of the additional and increased sales campaign in the promotion of which additional monies were expended by appellant for advertising, the primary purpose of which was to make possible the sale of the lots involved at substantially higher prices than that originally intended and set forth in the list price schedule. That this was accomplished and all parties benefited thereby is indicated by the surplus set forth in the commission reports offered in evidence for identification, coupled with the finding of the court that appellant had, prior to the filing of the complaint therein, sold all of the property made available for sale by respondents pursuant to the original agreement of October 17, 1952.

Aside from the foregoing documentary evidence of a supplemental agreement, there is present in the offers of proof an intention on the part of the parties to novate the original agreement of October 17, 1952. This they had a right to do under the provisions of section 1698 of the Civil Code which provides that ''A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise.'' An executed oral agreement is one the terms of which have been fully performed. Civil Code, section 1698, has been applied to numerous forms of transactions, particularly in those transactions concerning the sale, transfer or leasing of real property, wherein the statute of frauds is generally pertinent. For instance, it has been held that where there was performance of and effect given to an executed oral change of the selling price specified in a written agreement for the sale of land by a broker, a commission may be collected (*Moore* v. *Borgfeldt,* 96 Cal.App. 306, 311 [273 P. 1114]). (See also *Bard* v. *Kent,* 37 Cal.App.2d 160, 163 [99 P.2d 308].)

Oral agreements to accept less rental than the amount specified in written leases for terms longer than one year have been held valid under Civil Code, section 1698, when they have been executed by payment and acceptance of the reduced rent (*Sinnige* v. *Oswald,* 170 Cal. 55, 57 [148 P. 203] ; *Anderson* v. *Adler,* 42 Cal.App. 776, 779 [184 P. 42]). A similar conclusion was reached by the court in *Estate of McDougald,* 146 Cal. 196, 199 [79 P. 878], with regard to an executed oral agreement by a mortgagee to accept a lower rate of interest than that specified in the mortgage note. And in *Conway* v. *Moore,* 70 Cal.App.2d 166, 171 [160 P.2d 865], an executed oral modification of the method of payment specified in a

written contract for the purchase and sale of land was held effective as against a contention that it involved a violation of the statute of frauds.

We are persuaded that the offers of proof made by appellant contain sufficient evidence from which the court could have found that there existed a written collateral agreement or a supplemental novated oral agreement fully executed and that it was error to reject and refuse to consider the same.

█ As to the statute of frauds, it has often been held that a fully executed parol contract cannot be affected by such statute, and cannot be assailed by either party or by third persons, on the ground that it is not in writing (*Bates* v. *Babcock*, 95 Cal. 479, 488 [30 P. 605, 29 Am.St.Rep. 133, 16 L.R.A. 745]; *Dean* v. *Davis*, 73 Cal.App.2d 166, 168 [166 P.2d 15]; *Kreling* v. *Walsh*, 77 Cal.App.2d 821, 832 [176 P.2d 965]; *McComsey* v. *Leaf*, 36 Cal.App.2d 132, 142 [97 P.2d 242]; *Freitas* v. *Freitas*, 31 Cal.App. 16, 19 [159 P. 611]). █ As was said in *Wilson* v. *Bailey*, 8 Cal.2d 416, 422, 423 [65 P.2d 770], quoting from *Seymour* v. *Oelrichs*, 156 Cal. 782, 794 [106 P. 88, 134 Am.St.Rep. 154], and *Carpy* v. *Dowdell*, 115 Cal. 677, 687 [47 P. 695], respectively:

" 'The right of courts of equity to hold a person estopped to assert the statute of frauds, where such assertion would amount to practicing of fraud, cannot be disputed. It is based upon the principle "thoroughly established in equity, and applying in every transaction where the statute is invoked, that the statute of frauds having been enacted for the purpose of preventing fraud, shall not be made the instrument of shielding, protecting or aiding the party who relies upon it in any perpetration of a fraud or in the consummation of a fraudulent scheme." '

". . . 'The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both.' " (See also *Wade* v. *Markwell & Co.*, 118 Cal.App.2d 410, 421 [258 P.2d 497, 37 A.L.R.2d 1363]; *Pruitt* v. *Fontana*, 143 Cal.App.2d 675, 687 [300 P.2d 371].) Furthermore, in the case at bar, if respondents are not estopped from asserting the statute of frauds against appellant, the foregoing two letters written by the former on November 20, 1952 and February 4, 1953 furnish sufficient compliance with the statute of frauds (*Hel-*

*lings* v. *Wright,* 29 Cal.App. 649, 656 [156 P. 365]; *Arnold* v. *La Belle Oil Co.,* 47 Cal.App. 290, 295 [190 P. 815]; *McCartney* v. *Clover Valley Land & Stock Co.,* 232 F. 697 [146 C.C.A. 623]).

While the action of the court in the case at bar was rather unique, in that it made its rulings and excluded the evidence prior to any motion therefor on the part of respondent, we shall assume that the question on appeal is the correctness of the judgment of the trial court on the basis of appellant's pleadings and offers of proof. When both the pleadings and offers of proof are considered in the instant case, we are satisfied that appellant was entitled to a trial upon the merits, and that since no evidence was received except the original agreement of October 17, 1952, it is manifest that many of the findings are without evidentiary support.

The judgment is reversed and the cause remanded for a new trial.

Fourt, J., and Lillie, J., concurred.